UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| LOUIS SAIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO.  15-cv-1045 |
| | ) | JURY TRIAL DEMANDED |
| FJ MANAGEMENT, INC. d/b/a FLYING J, INC., | ) | |
| FLYING J INSURANCE SERVICES, INC., and/or | ) | |
| its Successor, THE BUCKNER COMPANY, | ) | |
| TRANSPORTATION ALLIANCE BANK, INC., | ) | |
| TRANSPORTATION ALLIANCE LEASING, LLC, | ) | |
| TAB BANK, INC., TAB BANK, INC. d/b/a | ) | |
| TRANSPORTATION ALLIANCE LEASING, LLC, | ) | |
| JAGJIT "J.J." SINGH, STEPHEN PARKER, | ) | |
| JOHN DOES A, B, and C, AND | ) | |
| JANE DOES A, B, and C, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## COMPLAINT

_____

COMES NOW the Plaintiff for causes of action against the named Defendants and would show unto the Court:

## I.      JURISDICTION AND VENUE

1.      This is an action for damages, declaratory and injunctive relief both preliminary and permanent, arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961. Jurisdiction is invoked pursuant to 28 U.S.C.§ 1331 and 1332.  Diversity jurisdiction is also invoked pursuant to 28 U.S.C. § 1332.  Declaratory and injunctive relief is authorized pursuant to 28 U.S.C. § 2201 and 2202.  Plaintiff further invokes the pendent jurisdiction of this Court to hear and determine claims arising under state law, including but not

1

limited to statutory claims under the Tennessee common law claims for fraud, intentional misrepresentation, negligent misrepresentation, abuse of process, malicious prosecution and conspiracy to commit some and/or all the aforementioned torts.  The conduct at issue was directed at residents of this district and all defendants had substantial contacts with the state of Tennessee and this district and thus vesting jurisdiction in this Court.

2.      Diversity jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 in that the amount in controversy is in excess of $75,000.00, exclusive of interest and costs, and the Plaintiffs and all Defendants are citizens of different states.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) in that the Plaintiff and all Defendants reside and/or conduct business in this District and/or a substantial part, if not all, of the event, acts and/or omissions giving rise to the claim occurred in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965(a) in that all parties either reside, are found, have an agent, and/or transact his/her/its affairs in this District.

## II.      PARTIES

4.      The Plaintiff, Louis Saia, (herein "Saia") is a citizen and resident of Madison County, Tennessee with his residence address at 46 Dovecrest Cove, Jackson, TN 38305 and is/was the sole shareholder, president and CEO of Saint Michael Motor Express (herein "St. Michael" or "Debtor"), a Tennessee corporation, having its principal place of business at 141 Law Road, Jackson, TN 38305.  Prior to St. Michael's filing a Chapter 11 bankruptcy in the United States Bankruptcy Court for the Western District of Tennessee on May 22, 2008 which was subsequently converted to a Chapter 7 bankruptcy, cause number 08-11838, the Debtor was engaged in interstate commerce.

2

5.      The Defendant, Flying J, Inc., is a closely held, for profit corporation with a principal address of 1104 County Hills Drive, Ogden, UT 84403 and may be served through its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312. On July 1, 2012, Flying J, Inc., which was then in Chapter 11 Bankruptcy, merged with Pilot Corporation to form Pilot Flying J, LLC and continues to be either a parent, subsidiary, or affiliate. Defendant Flying J, Inc.'s successor is FJ Management, Inc.

6.      The Defendant, FJ Management Inc., d/b/a Flying J, Inc. is a for profit corporation with a principal place of business registered as c/o Eva Jane C. Marsh, 185 S. State Street, Suite 201, Salt Lake City, UT 84111-1561 and may be served through its registered agent Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312. Defendant, FJ Management, Inc. is the successor corporation to or "name change" of Flying J, Inc.

7.      The Defendant, Flying J Insurance Services, Inc. and its successor, Defendant, The Buckner Company, was/is a for profit corporation with its principal place of business located at 1104 County Hills Drive, Suite 510, Ogden, UT 84403. There is no registered agent listed with the Tennessee Secretary of State. At pertinent times herein, Defendant, Flying J Insurance Services, Inc. was a wholly owned subsidiary and/or affiliated corporation of Flying J, Inc. Defendant, Flying J Insurance Services, Inc. and/or affiliated corporation of Flying J., Inc. Defendant Flying J Insurance Services, Inc. and/or its successor, The Buckner Company, was involved in the providing of insurance services for and transfer of Saint Michael Motor Express premium payments, escrow checks and other insurance transactions leading up to and after the purchase of Flying J Insurance Services, Inc. by Buckner in 2010. At all times pertinent herein, Flying J Insurance Services, Inc. and/or The Buckner Company served as an agent/representative/broker for Carolina Casualty Insurance Company, and as a result Carolina

Casualty Insurance Company is bound by representations made by and the acts and omissions of Flying J Insurance Services, Inc. and/or successor, The Buckner Company.

8.     The Defendant, Transportation Alliance Bank, Inc./TAB Bank, Inc. and/or TAB Bank, Inc. d/b/a Transportation Alliance Leasing, LLC (hereinafter "TAB") is an Industrial Loan Corporation with its principal place of business located at 4185 South Harrison Blvd., 2nd Floor, Ogden, UT 84403. TAB may be served through its registered agent at Corporation Service Company located at 2180 South 1300 East, Suite 650, Salt Lake City, UT 84106. At all times pertinent herein, TAB was/is a wholly owned subsidiary and/or affiliate of Flying J, Inc. and/or FJ Management, Inc.

9.     The Defendant, Transportation Alliance Leasing, LLC is a limited liability company with its principal place of business being 4185 Harrison Blvd., Ogden, UT 84403. Transportation Alliance Leasing, LLC may be served through its registered agent at Corporation Service Company located at 2180 South 1300 East, Suite 650, Salt Lake City, UT 84106. It was/is a wholly owned subsidiary, division and/or affiliate of TAB, and in turn, of Flying J Inc.

10.     The Defendant, Jagjit "JJ" Singh, is an individual who at all times pertinent herein, served as employee, agent, Vice President of Financial Services for Flying J Inc., Vice President of Financial and Communication Services for Flying J Inc., Director of Flying J Insurance Services, Inc., and an agent and representative of Flying J, Inc., and its subsidiaries and affiliates, including serving as CEO and Chairman of Transportation Alliance Bank, Inc., a wholly owned and operated subsidiary of Flying J, Inc. His address is 1267 Elk Hollow Road, North Salt Lake, UT 84054-3336.

11.     The Defendant, Stephen Parker, is an individual who at all times pertinent herein, was serving or had served as Vice President of Commercial Loans with Transportation Alliance

Bank, Inc., (TAB), a wholly owned and operated subsidiary of Flying J, Inc. His address is 2938 Pineview Dr., Salt Lake City, UT 84121-3428. Defendant, Parker, at all times pertinent herein, also served as an officer and/or agent and representative of Transportation Alliance Leasing, LLC.

12.     The "Flying J network" is a separate but real enterprise or association of individuals and/or closely affiliated business entities, all of whom act under the umbrella name of "Flying J" and, at all times pertinent herein, include the above named Defendants, each of whom acted in concert to promote the interest of the enterprise or association through unlawful/wrongful acts in interstate commerce, to the damage and detriment of the Debtor.

13.     The John Does, A, B, and C, and Jane Does, A, B, and C, are real, but unidentified, persons or entities whose identities are currently not known to Plaintiff.

### III.     FACTUAL ALLEGATIONS

14.     All allegations in paragraphs 1 to 12 are reiterated herein by reference as if specifically set forth verbatim.

15.     Plaintiff, Louis P. Saia, III, has years of extensive experience in the transportation industry. He previously served as President and CEO and then as a director of Saia Motor Freight Line, an over-the-road, trucking and transportation company, founded by his grandfather, until it sold to the publicly held Preston Corporation at which point Louis Saia, III, continued as President and CEO of Saia and as a director of Preston Corporation for approximately seven (7) additional years.

16.     Based upon his knowledge and experience, Saia recognized that a significant part of North America was underserved by refrigerated, over-the-road transport services and that a business opportunity existed for anyone who could rapidly fill this niche market.

5

17.     On or about September 25, 2002, Louis P. Saia, III, formed a Tennessee, for profit corporation, Saint Michael Motor Express.

18.     At all times pertinent herein, Plaintiff Louis P. Saia, III was the sole shareholder, president and chief executive officer of Saint Michael Motor Express.

19.     Over the period of Plaintiff's operations, Plaintiff invested approximately $10,000,000.00 from personal funds into the capital of Saint Michael Motor Express and he, along with his mother, Ann M. Saia, became personal guarantors of certain indebtedness incurred by Saint Michael Motor Express.

20.     At all times pertinent herein, Saint Michael Motor Express was in the business of providing over-the-road transportation services for goods and products through the United States, and, in particular, providing refrigerated transport services, including, but not limited to, pickup, hauling and delivery of freight via tractor/trailer commercial vehicles owned and operated and/or leased by the Plaintiff in the South and Northeastern United States.

21.     Plaintiff initially became acquainted with Defendant, Transportation Alliance Bank, Inc. and its subsidiaries in 2003 when he purchased Peterbilt Trucks from the Peterbilt dealership in Memphis, Tennessee who introduced Plaintiff to Defendant, Transportation Alliance Bank, Inc and arranged for the Defendant to finance the trucks Plaintiff was purchasing from the dealership.   In 2006 Plaintiff purchased more Peterbilt trucks through the same dealership and again financed them through Defendant, Transportation Alliance Bank, Inc., and its subsidiary.

22.     As Saint Michael Motor Express's (hereinafter sometimes "St. Michael" or "St. Michael's) business expanded, Defendant, Jagjit "JJ" Singh, contacted Saia, came to Tennessee,

and began soliciting all of St. Michael's financing, leasing, insurance, banking, factoring, diesel fuel purchase and transport services business on behalf of Flying J, Inc. and its subsidiaries.

23.     Defendant Singh represented and sold the "Flying J network" as a "one-stop shop" for all of St. Michael's trucking needs. Defendant Singh met with Saia on several occasions to encourage Saia to use the Flying J network to "help' expand St. Michael's business. Singh, acting as agent, representative and officer of and, on behalf of Flying J, Inc., and its wholly owned, and/or dominated subsidiaries, offered various transportation, insurance and finance services to St. Michael including: (a) the provision of a line of credit; (b) the purchase and/or financing for St. Michael's tractor and trailer fleet by Defendant, Transportation Alliance Bank, Inc. and through its TRAC leasing program, leasing the fleet back to St. Michael's through the bank's subsidiary, Defendant, Transportation Alliance Bank Leasing, LLC, with the right of St. Michael to purchase the vehicles at the end of the leases; (c) the factoring and aggressive collection of St. Michael's accounts receivable through Transportation Alliance Bank, Inc. and (d) furnishing insurance for Saint Michael Motor Express's cargo and fleet through Defendant, Flying J Insurance Services, Inc., acting as the Plaintiff's insurance agent.

24.     In 2006, Saia, as CEO of St. Michael, met with Jagjit "JJ" Singh, who held himself out as being in control of and the decision maker for Flying J. Singh specifically proposed financing, upon information and belief, approximately 60 trucks and 30 trailers, providing  the insurance, products and services, the factoring of St. Michael accounts, as well as providing fuel purchase services, leasing the St. Michael fleet of tractors and trailers to Plaintiff's company, and the provision of credit financing. Defendant, Jagjit "JJ" Singh met with Saia on multiple occasions in Tennessee to sell the Flying J network, enterprise and/or the association to St. Michael.

25.     Flying J, Inc., at all times pertinent herein, touted itself as 17th largest privately held company in the United States, with sales of $15 billion and was best known for what it claims the hospitality "Cadillac" nationwide network of transportation, financing, and fueling services and travel plazas located on Interstate highways in 40 states in the United States and seven provinces in Canada.

26.     As a result of the representations by Defendant Singh, made on behalf of the Flying J network, Saia, in or about April 2006, agreed to conduct all of his business, except for the factoring offered and fuel, through the Flying J network. The St. Michael's banking, bank accounts, credit line and other related services were to be through Transportation Alliance Bank, Inc. All financing of the fleet and of the related leases were to be conducted through the bank or its subsidiary, Transportation Alliance Leasing, LLC. St. Michael's insurance was obtained through Flying J Insurance Services, Inc. St. Michael's factoring and fuel purchased through Flying J entities first began in approximately October 2007 and June 2008, respectively.

27.     In or about April 2006, Saint Michael was extended a line of credit, personally guaranteed by Plaintiff and his mother, Ann Saia, in the amount of $800,000.00 with Defendant Transportation Alliance Bank, Inc.

28.     The St. Michael's and St. Michael's d/b./a St. Michael Hunting and Fishing tractors and trailers were purchased by Defendant, Transportation Alliance Bank, Inc. and then, in turn leased to the Plaintiff through the Defendant's subsidiary, Transportation Alliance Leasing, LLC, under a Master Lease Agreement whereby St. Michael, as Lessee, leased each of the tractors for 54 months and the trailers for 60 months with the right to purchase each of them at the end of the lease term for a set price of not more than the residual agreed upon amount, which varied between $13,000 and $24,000 depending on the vehicle involved.

29.     St. Michael also entered into leases with Transportation Alliance leasing, LLC through St. Michael's Hunting and Fishing, for 15 of the 60 trucks, at the direction of Jagjit "JJ" Singh. Upon information and belief, Singh was only able to approve financing of 45 trucks at one time, so he directed St. Michael's to sign altered documents and enter into then leases for the remaining 15 trucks using the St. Michael Hunting and Fishing name to avoid exceeding his authority. At all times during the lease, payments were made for all 60 trucks by St. Michael and all payments were unilaterally removed from St. Michael's accounts for line of credit with TAB Bank and Transportation Alliance Leasing. The involvement of St. Michael Hunting and Fishing was created by and is limited to the deceptive act by Jagjit "JJ" Singh to purportedly avoid exceeding approval limit of leasing 45 trucks at one time. In all actions taken concerning the trucks, including their repossession, TAB Bank represented to the Court that all of these trucks were leased by St. Michael.

30.     On June 21, 2006, Defendant, Stephen S. Parker, acting as the Vice-President of Defendant, Transportation Alliance Bank, Inc. advised Saia as to the type and amount of insurance coverage required for St. Michael's fleet and cargo. Parker directed Saia, in turn, to contact Flying J Insurance Services, Inc. and send a security deposit and insurance to the Defendant Bank's subsidiary, Transportation Alliance Leasing, LLC.

31.     Saint Michael's fleet of tractors and trailers were financed through Flying J/TAB Bank/Transportation Alliance Leasing, LLC. St. Michael's banking transactions were with Transportation Alliance Bank, Inc., its liability and cargo insurance were purchased and handled through Flying J Insurance Services, Inc. and its fuel was purchased through Flying J with participation in the Flying J discount rebate program.

32.     The leased tractor/trailers in St. Michael's fleet were worth in excess of the usually expected depreciated market value for over-the-road tractors because of their age, the high quality of maintenance that Plaintiff's company performed on them, and because the trucks were "grandfathered" under governmental regulatory emission standards, making the cost for their operation more economical than others.

33.     The liability and cargo insurance for St. Michael and its fleet was purchased each calendar year through Flying J Insurance Services, Inc. Katie London, the agency's Fleet Account Manager, served as the direct representative/agent and contact in charge of handling the St. Michael's account and providing services to St. Michael's.

34.     From 2006 up to the latter part of 2009, Ms. London timely and properly notified the Plaintiff of policy due dates, and the requirements, if any, as to the renewal of coverage, premium amounts, and other matters related to coverage. Up until September of 2009, London faithfully worked with St. Michael through Flying J Insurance Services, Inc. to obtain and provide the necessary coverages for St. Michael as agent that had been represented to Saia by Singh.

35.     Throughout the Plaintiff's relationship with the Defendants, and the Flying J network, JJ Singh sold the Plaintiff on the "one-stop shop" services including fuel, and Flying J, acting through Singh, offered and committed to pay a standard fuel rebate/discount to St. Michael's for fuel purchases made by the drivers of St. Michael's fleet. There was an established discount rate for diesel fuel purchases between Flying J and St. Michael Motor Express.

36.     Upon information and belief, the rebates to which St. Michael was entitled were withheld, not timely paid, and/or not paid when due and owing. When questioned by St. Michael's officers, the amounts of the rebate owed were then misrepresented by Defendants and,

although requested, no detailed accounting was provided. Upon information and belief, Flying J fraudulently failed to pay the agreed upon discounts or rebate owed to St. Michael, withheld funds, and delayed and/or manipulated payments, and deprived St. Michael of rebates to which it was entitled and converted same.

37.     As fuel prices increased and the transportation industry began to suffer from the economic downturn, purchasers of fuel and transportation services began to delay payment. At some point during the fall of 2007, The Defendants, acting through Singh and Parker, again approached Saia and represented the Defendant, Transportation Alliance Bank, Inc. could/would be able to better collect and handle Saint Michael's accounts receivable because of the strength and influence of the Flying J network. The individual Defendants represented that Transportation Alliance Bank, Inc.'s factoring and collection program would create an improvement in cash flow for Plaintiff, provide screening of potential customers, provide timely aggressive collection of accounts and more effective collection of past due accounts, while reducing administrative costs for Plaintiff.

38.     Based upon these representations by Defendants, which were false and known by Defendants to be false when made, Plaintiff agreed to enter into a factoring arrangement with Defendant, Transportation Alliance Bank, Inc. and signed the Defendant's form Accounts Receivable Purchase and Agreement. In point of fact, this contract of adhesion became an additional step used by the Defendants' network/enterprise to effectively take control of St. Michael's and Plaintiff's operations and enabled the Defendants and the Flying J network to carry out a scheme to take over Plaintiff's assets.

39.     Upon information and belief, Transportation Alliance Bank, Inc. wrongfully charged at least $127,151.61 in improper late fees to St. Michael.

40.     Upon information and belief, at all times, Defendants Transportation Alliance Bank, Inc. and Transportation Alliance Bank, Inc. on behalf of Flying J Insurance Services, Inc., Transportation Alliance Leasing, and Flying J, conducted business by wiring money from St. Michael's accounts receivable and line of credit amounts to other accounts used for Defendants' benefit.

41.     Defendants also gained total control over: (a) the St. Michael's line of credit and payments being made thereon; (b) the liability and cargo insurance and payments thereon; (c) St. Michael's access to fuel, fuel rebate payments, and fuel credit accounts; (d) St. Michael's ability to make payments on all accounts and/or services provided by The Flying J network thereon; (e) St. Michael's customer base and collection of monies owed to St. Michael for current and past due accounts; and (f) St. Michael's ability to make payments on leased equipment. Such gave the Defendants the ostensible ability to "legally" control and deny the St. Michael working capital and cut off its cash flow.

42.     In spite of Plaintiff's requests, Defendant Transportation Alliance Bank, Inc. refused to provide statements as to St. Michael's accounts, lease payments, and /or Defendant's collection efforts, providing only confusing and undecipherable reports with no back up documents. Upon information and belief, Defendant untimely and improperly debited St. Michael's accounts for payments to multiple entities within the Flying J network, failed to properly credit payments, and improperly charged late fees in an amount totaling not less than approximately $127,000, which monies were converted and not paid into St. Michael's bankruptcy estate as required.

43.     By controlling and manipulating St. Michael's accounts and cash flow, Defendants caused the Plaintiff to be repeatedly surprised at not being able to fund fuel

purchases, even though there should have been sufficient monies available for such purposes, and to pay for ongoing, normal trucking expense. This resulted in St. Michael's drivers and cargo being left stranded in route, while Plaintiff diligently worked to obtain alternate arrangements in order to complete deliveries.

44.     On the 22nd day of May, 2008, Saint Michael Motor Express filed for Chapter 11 Bankruptcy reorganization and protection.

45.     In sum, by withholding fuel rebate combined with poor collection results, significant late fees, the Defendants were able to financially choke Plaintiff and his business.

46.     During Plaintiff's Chapter 11 bankruptcy, Saia and his family used personal funds and assets to meet all St. Michael's obligations, continued to pay down the leases on the tractor/trailers as agreed and continued to meet St. Michael's obligations, owed to Defendants, reduced the St. Michael's total debt, downsized the company, and St. Michael's business began to slowly but steadily improve.

47.     On December 22, 2008, Defendant Flying J, Inc., along with its related affiliates, when faced with an extraordinarily huge cash flow shortage, filed its own petition for Chapter 11 Bankruptcy organization relief in the United States Bankruptcy Court for The District of Delaware, Case No. 08-13384(MFW).

48.     On December 23, 2008, the day after Defendant, Flying J, Inc. filed its petition for bankruptcy, the Federal Deposit Insurance Corporation, issued a Cease and Desist Order against Flying J's subsidiary Defendant, Transportation Alliance Bank, Inc., for "unsafe or unsound banking practices and violation of law and/or regulations" based on the deterioration of Flying J's financial condition. The Defendant bank consented to the Cease and Desist Order.

49.    The FDIC's cease and desist order prohibited certain "transactions", "covered transactions" and "extensions of credit" with or to Flying J, Inc. or any of its affiliates by Defendant, Transportation Alliance Bank, Inc.

50.    In order to carry out its reorganization plan, Flying J, Inc. and its related entities proposed a selected creditor payment plan which required a huge influx of cash to be created, in part, by selling off assets specified and from the ongoing business operations of the Flying J network.

51.    On or about June 18, 2009, Saint Michael received notice that Carolina Casualty Insurance Company would not renew St. Michael's then existing liability insurance coverage, under policy number CPT 351668, for its fleet. The notice was sent to Flying J Insurance Services, Inc.  Katie London, the Plaintiff's agent and representative at Flying J Insurance Services, Inc. and Flying J Insurance Services, Inc.'s Fleet Department Manager, advised Plaintiff of the notice but, at the same time, assured him that the Defendant agency would be able to place the insurance coverage for St. Michael with Carolina Casualty or another carrier.

52.    Upon receiving the information, about the notice of declination of insurance renewal, Saia began to immediately seek insurance coverage for St. Michael's fleet through other agencies and brokers. He quickly located two insurance brokers who, in turn, located insurance companies who agreed to provide the needed coverage and to provide quotes/offers. The brokers began actively negotiating the quote terms as to premium costs for Saint Michael. Saia, in turn, advised Katie London that he was in the process of obtaining the necessary liability insurance coverage. At this time, Ms. London assured Saia that additional quotes would not be necessary since Flying J Insurance Services, Inc. would obtain the needed insurance.

53.     On August 18, 2009, Katie London, in fact, acting as agent for Saint Michael Motor Express and as agent and representative of Flying J Insurance Services, Inc., requested Carolina Casualty Insurance Company to confirm its commitment to reinstate the Plaintiff's insurance coverage. Carolina Casualty Insurance Company agreed. Ms. London advised the Plaintiff that a quote had been obtained for St. Michael's coverage, and that coverage would, in fact, be reissued upon receipt of specified assurances as to premium payment, which assurances were immediately given by Plaintiff.

54.     On September 14, 2009, Carolina Casualty Insurance Company processed the renewal of St. Michael Motor's insurance policy, thereby negating the effect of the earlier issued notice of nonrenewal.

55.     On September 16, 2009, Carolina Casualty Insurance Company issued to Saint Michael Motor Express an offer quote for provision of liability insurance coverage for St. Michael Motor Express, Inc.'s fleet of tractors and trailers, Policy #CGP-351668-Q, with the policy period to begin September 20, 2009, and extending up to September 20, 2010. The annual premium quoted in the offer was $521,428. The offer/quote was specifically represented to remain open until the expiration date of the then existing policy #CPT351668, or until September 20, 2009, the policy's stated expiration date.

56.     Upon information and belief, with the time set for the completion of the reorganization plan of the Flying J entities and sale of assets rapidly approaching, the management of the Flying J network, i.e., Singh, Parkers, and John Does A, B, and C and Jane Does A, B, and C, engaged in a pattern of unlawful activity, by and through which the Defendants took unfair advantage of Flying J commercial customers, including Saint Michael Motor Express.

15

57.    Recognizing that the Flying J network exercised almost complete and total control over the operations of Saint Michael Motor Express, the Defendants set about to convert the assets and monies of Saint Michael Motor Express, in particular, the Plaintiff's monies on deposit, imposition of improper late charge assessments, and its fleet of tractors and trailers.

58.    Katie London, after receiving Carolina Casualty Insurance Company's agreement to reissue the policy and the quote, advised Saia that Plaintiff would be required to make a 20% deposit of the total premium amount.

59.    Upon information and belief, this "requirement" was "imposed" by the Flying J Defendants, believing that St. Michael and/or Saia would be unable to fund the 20% deposit on such short notice and, thus, would enable the Defendants to repossess and obtain St. Michael's equity in its fleet.

60.    St. Michael President and CEO, Saia, however, advised Ms. London that he would obtain the money needed for the deposit and, in fact, arranged for the payment of the "required" 20% deposit with personal monies from family. On September 19, 2009, he had traveled to Louisiana to pick up the necessary monies for the deposit in order to then transfer the deposit to Flying J Insurance Services, Inc. as purportedly "required".

61.    At the time of these communications, the existing liability insurance Policy #CPT351668 remained in effect and was, in fact, extended by Carolina Casualty Insurance Company beyond the policy expiration date until October 22, 2009.

62.    On or about September 19, 2009, Saia was called on his cell phone by Stephen Parker and told that St. Michael Motor Express, contrary to the representation made, would not be insured by Carolina Casualty Insurance Company. Knowing that Singh controlled the Defendant insurance agency and the Defendant bank, Saia demanded to speak with Singh. Saia's

request was denied. Parker then informed Saia that he Defendant, Transportation Alliance Bank, Inc. intended to file an emergency motion in St. Michael's bankruptcy in Jackson, Tennessee to request the Court to allow the bank to take control of and repossession of the St. Michael's Fleet. According to Parker, acting as an agent of Transportation Alliance Bank and Transportation Alliance Leasing, since Saint Michael Motor Express did not have liability insurance coverage, St. Michael was operating its fleet illegally.

63.     Knowing that what he was being told was contrary to what he had been earlier advised by Katie London, Saia then called Ms. London at Flying J Insurance Services, Inc. When he asked her what the problem was, she told him that she was not allowed to talk with him any further and that he would have to talk with Defendants, Parker and Singh.

64.     Flying J Insurance Services, Inc., acting as the agent for the named insured, Saint Michael Motor Express, had earlier completed the application to Great American Insurance Company Inland Marine for the Plaintiff's cargo insurance. Katie London then requested Joseph Weekly, an officer of St. Michael Motor Express, Inc. to sign the application and insurance premium finance agreement with Transportation Alliance Bank, Inc. for the cargo policy because Mr. Saia was out of town. Weekly did so.

65.     As threatened by Parker and Singh, on September 22, 2009, the Defendant, Transportation Alliance Bank, Inc. and its controlled and dominated subsidiary, Transportation Alliance Leasing, LLC, filed an emergency motion in the Plaintiff's Chapter 11 bankruptcy proceedings. Defendants represented that they had received a copy of the June 18, 2009 "Notice of Nonrenewal of Insurance" for liability coverage on numerous trucks leased by St. Michael and that the St. Michael's fleet of tractor-trailers were presently being operated "over-the-road" illegally because they did not have liability and cargo insurance coverage.

66.     The "nonrenewal" and purported lack of insurance coverage was asserted to be the basis for the emergency motion, the emergency hearing requested for the next day, and to provide the factual and legal basis for the order to prevent St. Michael from continuing operations. Based on this assertion, defendants sought immediate repossession and an order of abandonment by St. Michael of all of its leased vehicles and equipment. Additionally, Defendants sought to use the existing monies in the accounts receivable account of Saint Michael to fund bringing the tractors and trailers back to Transportation Alliance Bank/Transportation Alliance Leasing once repossessed.

67.     On September 23, 2009, Carolina Casualty Insurance Company presented Flying J with another insurance policy quote for St. Michael Motor Express, Inc.'s fleet of tractors and trailers with a policy period beginning September 24, 2009 – September 24, 2010, and an annual premium of $427,500.00.

68.     On the same day, September 23, 2009, Defendants, Transportation Alliance Bank, Inc. and its wholly owned, dominated and controlled subsidiary, Transportation Alliance Leasing, LLC, appeared in the Bankruptcy Court and pursued the emergency motion.

69.     The insurance quote totaling $427,500.00 complete with amortization schedule requiring a down payment of $85,500.00 issued on September 23, 2009, by Carolina Casualty Insurance Company was provided to Katie London at Flying J Insurance Services, Inc. by submission #0621878, for a policy period from September 24, 2009 to September 24, 2010. Flying J Insurance Services, Inc. completed another application from St. Michael Motor Express to Carolina Casualty Insurance Company, and again used Joseph Weekly, an officer of St. Michael, on September 23, 2009, to sign for the renewal on September 24, 2009.   The application was for the same coverage as that provided in the then still existing, effective and

18

outstanding insurance offer/quote dated September 16, 2009, made to St. Michael by Carolina Casualty Insurance Company.

70.     At the same time Defendants were appearing before the Bankruptcy Court to repossess St. Michael's fleet based on the false and known to be false statements by Defendants. Defendant Parker called Saia, who was in Louisiana, and told Saia that if he, as the President and sole owner of St. Michael Motor Express, Inc. did not consent to the emergency motion and repossession of St. Michael's fleet of vehicles, the vehicles would be operating without insurance and the trucks out on the road would be stranded and the customers' cargo would perish. The drivers would then be forced to abandon the St. Michael's trucks and cargo on the spot. Faced with this threat, believing Parker's fraudulent misrepresentation that Defendants could not procure insurance for continued operation of the fleet and in order to protect St. Michael's customers, Saia then called his attorney and wife, who, at the time, were attending the emergency motion hearing in Bankruptcy Court, and instructed them to consent to the motion.

71.     Based upon the false and fraudulent representations made by Defendant Parker, St. Michael not only acquiesced in the repossession of the trucks and trailers, and acquiesced to the use of the accounts receivable monies, but unknowingly waived any and all defenses to the seizure or misrepresentations by consenting to the Court Order.

72.     Although Transportation Alliance Bank, Inc. and Transportation Alliance Leasing, LLC represented to the Court that a notice of nonrenewal had been issued on June 18, 2009, they failed to disclose that Stephen Parker, Vice President of Commercial Loans at Transportation Alliance Bank, had instructed Katie London, in August of 2009, to obtain renewal of the policy despite the notice. They failed to disclose that Ms. London had advised St. Michael that the policy would be obtained. They failed to disclose that the application for renewal had

been completed at Ms. London's direction with the intention of obtaining liability and cargo coverages and that Carolina Casualty Insurance Company had, in fact, agreed to renew coverage, that there had been an outstanding offer and acceptance of insurance coverage, and that St. Michael actually was in the process of paying the premium deposit while Defendants were misleading the Court.

73.     Defendants repeated in open court the misleading, false and incomplete statements that were asserted in this motion. Defendants failed to disclose their direct role in the scheme to prevent St. Michael from obtaining the coverage or the true facts concerning the status of St. Michael Motor Express's liability and cargo insurance coverage. Thus, Defendants provided false and misleading information to Saint Michael Motor Express and to the Bankruptcy Court, which Defendants knew to be false, and upon which false representations the Plaintiff reasonably relied to his detriment and upon which the Court relied as to the basis for its Order.

74.     Upon receiving the Order, Defendants immediately seized and repossessed all of St. Michael's trucks, trailers and cargo, and ostensibly used the proceeds in the accounts receivable account of St. Michael to repossess the trucks and trailers. Upon information and belief Defendants liquidated and/or sold, pledged or transferred the St. Michael's fleet for the benefit of Flying J, Inc. and/or its subsidiaries. However, no proof of the sale of this property has been provided, and upon information and belief, no reasonable sale as required by law was conducted in order to mitigate Defendants' damages.

75.     At the time of the fraud committed by Defendants, St. Michael's trucks and trailer held significant value, likely well in excess of $4,000,000.00.

76.     During this period, Saint Michael had on deposit the prior year's escrow insurance premium in the amount of $37,438.20 with Gresham & Associates, Inc. and/or Gresham & Associates of Indiana and/or Gresham Associates, LLC, the agent and/or broker for Defendants Flying J Insurance Services, Inc. and Carolina Casualty Insurance Company. These funds were not returned to the St. Michael, nor turned into the Trustee for the St. Michael's bankruptcy estate as required, but were wrongfully converted by Defendants.

77.     On October 22, 2009, Carolina Casualty Insurance Company, issued a notice to "close" Saint Michael Motor Express's coverage under policy #CPT351668. Thus, until at least that date, contrary to Defendants' representations to the Court, St. Michael had insurance coverage.

78.     At all times up to and including September 23, 2009, Plaintiff reasonably relied upon all false misrepresentations made by Defendants, Jagjit "JJ" Singh, and Steve Parker, Flying J Insurance Services, Inc, Flying J, Inc., Transportation Alliance Bank, Inc. and the "Flying J network" of companies to St. Michael's detriment.

79.     At all times during which the above fraudulent acts took place, the representations made by Defendants were false and known to be false by the makers when made. Defendants knew that Plaintiff was relying upon Defendants' representations to his detriment.

80.     At all times pertinent herein, the affiliated Defendant "entities" and all subsidiaries, while acting in concert, and through the Flying J network, association, enterprise, and/or arrangement, in order to take control of and convert assets of St. Michael, had no separate mind or real existence of their own, other than as mere business conduits within the network, making each of them a mere instrumentality and/or alter ego of the Flying J network, the enterprise. Defendants and each of them, acting in concert with each other, used the network to

accomplish unlawful purposes, to engage in a pattern of fraudulent scheme to defraud, obtain and seize the St. Michael's assets and properties. Therefore, the corporate veil of Flying J, Inc. should be pierced, and each and all of the Defendants should be held jointly and severally liable for the fraudulent acts and wrongs complained of herein.

81.     The Defendants, individually, collectively, and through the Flying J network enterprise, and/or association used the United States mail, internet, wire and telephone directed to and within the State of Tennessee and elsewhere in order to carry out the scheme to defraud: including but not limited to the following: Defendant Steve Parker, individually and acting on behalf of each of the other Defendants in the Flying J network made fraudulent misrepresentations over the telephone to Plaintiff stating that they were unable to obtain insurance for St. Michael's, Parker called Saia and coerced him into agreeing to the Consent Order.  Katie London, acting as the agent and representative of the Flying J network defendants repeatedly assured Plaintiff by telephone that the Flying J Defendants had obtained insurance for St. Michaels.  London also exchanged emails with Plaintiff and/or other St. Michael's employees indicating that the insurance had been procured.

82.     On September 22 and 23, 2009, even though St. Michael was not in default on its agreements with the Flying J network, had an existing policy that extended through October 22, 2009, and had obtained monies for the premium deposit required by the Carolina Casualty Insurance Company rendering the issue of the alleged "non-insurance" moot, the Defendants nevertheless proceeded to obtain the "emergency" seizure and forfeiture of the trucks and trailers by misleading the Bankruptcy Court.

83.     The order allowing repossession of the St. Michael's leased trucks was, upon information and belief, obtained by fraud, abuse of process and as a result of the concerted

unlawful and fraudulent actions of the Defendants and amounts to a fraud in Bankruptcy under title 11 of the U.S. Code.

84.     In June of 2010, Transportation Alliance Bank, Inc. was notified that the FDIC had "reason to believe" that Transportation Alliance Bank, Inc. had violated the FDIC's cease and desist order and assessed a fine against Transportation Alliance Bank, Inc. of $97,500.00.

85.     On July 9, 2010, the United States Bankruptcy Court confirmed the plan of reorganization filed by Flying J, Inc. and related entities. In the confirmation order, paragraph 13(f), successor liability of the "reorganized St. Michaels" and their successor and assigns was eliminated from any claim which arose prior to the "Effective Date" of the confirmation Order. This elimination of liability, however, did not release any party or successor from liability for criminal, or grossly negligent or "willful misconduct."

86.     Defendants, Transportation Alliance Leasing, LLC, Transportation Alliance Bank, Inc. and Flying J Insurance Services, Inc. are and were at all times pertinent herein part of the interrelated and intertwined businesses owned, controlled, and/or operated by Defendant, Flying J, Inc. and/or FJ Management, Inc. in the "network" with Defendant, Jagjit "JJ" Singh, being the officer in charge of the banking, insurance, and finances of the network and exercised control by directing the actions of said Defendants.

87.     Defendant, Jagjit "JJ" Singh repeatedly represented to Plaintiff and others that he exercised complete control over Flying J Insurance Services, Inc., Transportation Alliance Bank, Inc. and Transportation Alliance Leasing, LLC and money and financial matters within the Flying J network. Therefore, he knew that the actions of these Defendants were unlawful, not arms-length, and were designed by Defendants, acting in concert with each other and other as yet

identified co-conspirators, to use the Flying J Association, enterprise and/or network to benefit Flying J, Inc.

88.     In furtherance of the scheme and conspiracy to defraud the Plaintiff and St. Michaels the Defendants, through their concerted fraud, misrepresentations and deceit, caused the St. Michael's credit line, initially $800,000.00 to go into default and the personal guaranties of Plaintiff, and his mother, Ann Saia, to be called. In that regard Defendant Transportation Alliance Bank, Inc. filed a lawsuit in the Utah State Court on October 29, 2010 seeking to collect on the balance claimed to be owed on the line of credit.

89.     The Utah lawsuit to enforce the personal guarantees was based solely on the fraudulent acts of the Flying J network as set out above. The Utah case was premised solely on the fraudulent misrepresentation made by the Flying J Defendants in St. Michaels' Bankruptcy proceedings as set out above.

90.     Through the discovery process in the Utah case, Plaintiff was provided by Carolina Casualty Insurance Co, also a named defendant in that lawsuit, a document from Carolina Casualty, discovered by Plaintiff's attorneys in March of 2012, indicating that it had, in fact, provided a quote to Flying J Insurance for the insurance for St. Michaels on September 16, 2009. Plaintiff turned that document over to Marianna Williams, St. Michael's bankruptcy trustee who subsequently filed an adversary lawsuit in Bankruptcy court for fraud and civil RICO, among other causes of action.

91.     TAB's pleadings in the Utah case also fraudulently assert a deficit in St. Michael's A/R in the amount of $57,382.97. St. Michael Motor Express did not have any deficit in its A/R loan facility but rather had significant reserves on account, until TAB received unfettered access to St. Michael's accounts. The A/R Agreement required a 10 % reserve on all

funds advanced as a term of the agreement. St. Michael's reserve account was fully funded. Additionally, TAB invoiced and collected seven to ten days of work that had not yet been invoiced. Finally, TAB hired ex St. Michael employees to collect past due accounts that had already been debited from St. Michael's accounts after aging over 90 days in accordance with the terms of the A/R Agreement.

92.     TAB's past due collection efforts continued for at least five months after the company was closed and well after all trucks had come in.  TAB kept all funds it collected and never provided the Trustee with an accounting. TAB's Utah pleadings assert a $57,382.97 deficit despite St. Michael's reserves and the collections made by TAB.

93.     TAB's pleadings in the Utah case are rife with erroneous, deceitful and misleading facts and support. At one point TAB illegally offered to dismiss the claim against Plaintiff if he would refuse to cooperate with the bankruptcy Trustee in the adversary proceeding, essentially asking the Plaintiff to commit fraud and obstruct justice on the U. S. Trustee, the case trustee and the Bankruptcy Court, which Plaintiff refused to do.

94.     Because of TAB's fraudulent lawsuit, racketeering and coercive threats, Plaintiff's mother settled the claims TAB had brought against her in the Utah case on the $800,000.00 personal guarantee for $1,200,000.00.

95.     On August 27, 2014, the Utah Court ruled that Mr. Saia was liable for breach of contract and on November 20, 2014, awarded TAB damages in the amount of $1,830,802.94 against Plaintiff, on his personal guarantee of the same $800,000.00 line of credit. Furthermore, the Court awarded TAB with pre and post judgment interest at the rate of 30% per annum on the Guaranty regarding the $800,000 Note and pre and post judgment interest at the rate of 28.8% per annum on the A/R Agreement deficiency. Currently, interest is accruing at approximately

$45,770.07 per month. The court also awarded TAB future attorney's fees in connection with the collection and execution of the said judgment.  TAB engaged in additional fraudulent misrepresentations to the Utah court at the damages hearing, including but not limited to changing the date and misrepresenting to the Court the date that they claimed St. Michaels' had defaulted on the its obligations in order to deceive the court into increasing the amount of damages to which it claimed it was entitled in that lawsuit.

96.     Upon information and belief, after Transportation Alliance Leasing, LLC and Transportation Alliance Bank, Inc. repossessed the trucks and trailers, these vehicles and the proceeds from the sale or transfer thereof and all monies or choses in actions as to the accounts receivable for St. Michael were kept by Transportation Alliance Bank, Inc/Transportation Alliance Leasing, LLC and not turned over to the Trustee or St. Michael's estate.

97.     Pilot and Flying J merged and created Pilot Flying J on July 1, 2010.

98.     All of the statements, repetitions, misrepresentations made, and the acts of the individual Defendants and the corporate Defendants were committed by them while acting in concert with each other and as a part of a conspiracy to defraud against and to commit the illegal acts aimed at St. Michael and the Plaintiff, all in violation of the laws of the State of Tennessee and United States of America, as more specifically set forth hereinabove.

99.     Each of the wrongful and illegal acts and omissions alleged herein were committed at the direction and/or ratification, of and by each Defendant and each Defendant is a co-conspirator with all other Defendants and is liable as a joint actor and/or co-conspirator for all acts taken in furtherance of the conspiracy.

## IV.   CAUSES OF ACTION

### COUNT I

### FRAUD/TORTIOUS MISREPRESNTATIONS/FRAUDULENT TRANSFER

#### A.   <u>FRAUD</u>

100.   The allegations of paragraphs 1 through 99 hereinabove are reiterated and incorporated as if fully set forth herein.

101.   The facts, as specifically pled by incorporation, and set forth hereinabove, are specifically reasserted here for the purposes of alleging the fraud committed upon the Plaintiff and St. Michael.

102.   The statements, representations, and activities of the Defendants and each of them as carried out by the Defendants, individually, and acting in concert with and through each other and/or their agents and the companies, and the Defendants were a part of a scheme to defraud, intended to defraud and, in fact, did defraud the St. Michael Corporation, Plaintiff and Ann Saia, by causing the Plaintiff and St. Michael to rely upon the Defendants' misrepresentations to their detriment.

103.   At the time the statements were made, the Defendants, and each of them, either directly or by imputation, knew that the representations, when made, were false, and were intended to mislead and to result in an unfair advantage, and, by wrongful inducement, to cause St. Michael to waive defenses to the emergency motion and to mislead the Court in order to allow the Defendants to obtain title to St. Michael's assets through the fraudulent repossession, transfer and sale of assets; and to allow the Defendants to wrongfully, fraudulently, and illegally take the monies and properties of the Plaintiff and his company St. Michael to whom and about whom the misrepresentations were made.

104.    Specifically, the Defendants made those representations set forth herein above.

105.    In reliance upon false representations made by Defendants, their agents, assigns, employees, and representatives, the Plaintiff and St. Michael were misled to their detriment into: (A) not taking actions to obtain the insurance that ultimately led to the repossession of the St. Michael's properties; (B) to acquiesce in, rather than contest, the emergency abandonment hearing; (C) to agree to allow the properties to be repossessed and deemed abandoned; (D) to forego attempts to obtain insurance; and (E) to allow the Defendants to take title to all of the St. Michael's equipment and assets, essentially forever shutting the doors of Plaintiff's company.

106.    As a direct and proximate result of the fraud committed by the Defendants, and each of them, acting in concert with each other, maliciously, intentionally, and calculated to deceive the Plaintiff and St. Michael, Plaintiff is entitled to recover judgment against Defendants for recovery of compensatory and punitive damages in an amount to be determined by the jury and/or fact finder.

## B. FRAUD ON THE PLAINTIFF, ST. MICHAEL AND THE BANKRUPTCY COURT

107.    The allegations of paragraphs 1 through 106 hereinabove are reiterated and incorporated as if fully set forth herein.

108.    The actions of the Defendants, individually and acting in concert with one another as set forth above, amount to bankruptcy fraud and fraud in insolvency in violation of 11 U.S.C. §§152, 153 and 157 and T.C.A. §39-14-117, given that Defendants have, knowingly and fraudulently:

(A)     caused the transfer and conversation of property and the concealment of property of Plaintiff's company, St. Michael;

(B)     devised a scheme or artifice to defraud the Plaintiff and obtain trucks, trailers and equipment of St. Michael for below market value, by repossession, and, thereby asserting legal title to the property.

109.    As a direct and proximate result of the fraud committed by the Defendants, and each of them, acting in concert with each other, maliciously, intentionally, and calculating to deceive, the Plaintiff suffered injury and damages for which Plaintiff is entitled to recover judgment against Defendants for compensatory and punitive damages in an amount to be determined by the jury and/or fact finder.

## COUNT II

## TORTIOUS CONSPIRACY

110.    The allegations of paragraphs 1 through 109 hereinabove are reiterated and incorporated as if fully set forth herein.

111.    All of the acts and activities of the Defendants and each of them as set forth hereinabove were either lawful acts taken for an unlawful purpose and/or unlawful acts taken in concert as a part of a wrongful and unlawful scheme to wrongfully defraud, convert, and obtain the Plaintiff's properties by fraudulent and unlawful means for the benefit of said Defendants and/or the Flying J network, and, as a result thereof, the Defendants have committed the tort of unlawful conspiracy under the common law of the State of Tennessee.

112.    As the direct and proximate result of the Defendants' unlawful conspiracy, and the wrongful actions and omissions of the Defendants and each of them, jointly and severally, and acting in concert with each other, which were intentional, malicious and calculated to deceive, the Plaintiff suffered injury and damages for which Plaintiff is entitled to recover

judgment against the Defendants for compensatory and punitive damages in an amount to be determined by the jury and/or fact finder.

## COUNT III

## CIVIL RICO

### A.  CONDUCT OF THE SCHEME AND ENTERPRISE

113.    The allegations of paragraphs 1 through 112 hereinabove are reiterated and incorporated as if fully set forth herein.

114.    The activities of the Defendants amount to a pattern of racketeering activity connected with the establishment, conduct, and/or control for the RICO "enterprise" (The Flying J network), for the purposes of creating, pursuing and financing this scheme  to obtain through illegal means, the business, properties, and assets of the Plaintiff and St. Michael. The Defendants, and each of them, were associated with said enterprise, and directly participated in the enterprise's affairs through the pattern of unlawful activity.

115.    Specifically, the Defendants, and each of them, participated in the continuing and ongoing conspiracy to defraud the Plaintiff and St. Michael, as set forth specifically herein.

116.    The racketeering acts set forth herein occurred within ten years of each other and pose a threat of continuing if not abated.

117.    This case arises from an illegal scheme by Defendants to deprive the Plaintiff and St. Michael of their properties, monies, and assets by use of illegal means.

118.    Defendants began the illegal scheme at sometime in or after 2006, and continue the scheme to the present, as of the filing of this Complaint.

119.    The Defendants in this action are various individuals and entities who have, together and in combination, conspired to and perpetuated multiple violations of RICO, and

engaged in fraud, including, but not limited to, mail, wire, and bankruptcy fraud as set forth hereinafter. Defendants also committed conversion, and aided and abetted the other Defendants' unlawful conduct.

120.   Each of the various wrongful acts set forth hereinabove and herein below, is a specific, predicate act by Defendants to carry out and accomplish the fraudulent scheme to obtain the properties of the St. Michael through a purported "abandonment", to retain all of St. Michael's accounts receivable proceeds and monies, escrow accounts, and to deprive the St. Michael and the Plaintiff of their properties, assets and monies, without any compensation therefore. The Defendants, through the pattern of such racketeering activities, knowingly participated in said wrongful acts, all in violation of 18 U.S.C. §1961, et seq.

121.   Upon information and belief, Singh and/or, at his direction, Defendant Parker, directed the fraudulent activities and/or enterprise as set forth herein. John Does A, B and C and Jane Does A, B, and C may also play roles in the enterprise.

122.   Defendant Singh, a Utah resident, is distinct from the RICO enterprise and Defendants as defined herein, as he participates in the affairs of the RICO enterprise defined herein. He is an agent of Defendants as listed herein and is the general manager of the scheme, and all of the wrongful acts are attributable to Defendant and each of them. In the hierarchy of the Flying J network RICO enterprise described herein, Defendant Singh ranks at the top as he, at all times, controlled the purposes and operations of the unlawful enterprise, as well as the receipt, flow, use and transfer of money wrongfully obtained from the Plaintiff and St. Michael through a pattern of criminally unlawful racketeering activity.

123.   Defendant Parker, a Utah resident, is distinct from the RICO enterprise defined herein, as he participates in the affairs of the RICO enterprise defined herein.  He is an agent of

Defendants as listed herein and helped to manage and carry out the scheme, and all of his wrongful acts are attributable to Defendants and each of them. In the hierarchy of the RICO enterprise described herein, Defendant Parker ranks below Singh, as he at all times has acted to perform and carry out the purpose of the unlawful enterprise, the purposes and operations of the enterprise, as well as collect money from the Plaintiff and St. Michael, and pass this money as directed by Singh and/or other Defendants in the Flying J network.

124. The Flying J network is the separate association or enterprise through which Defendants carried out their scheme, and is a RICO enterprise as defined by law.

125. Defendants Flying J, Inc., Flying J Insurance Services, Inc. and/or its successor, The Buckner Company, Transportation Alliance Bank, Inc. and/or TAB Bank, Inc. and/or Transportation Alliance Leasing, LLC, Transportation Alliance Leasing, LLC and FJ Management, Inc. are companies owned by Flying J, Inc., and controlled by or through Singh and Parker, as agents of the Flying J network, which companies were used to promote and continue the illegal scheme and /or illegal enterprise.

126. All Defendants, working in concert, are jointly and severally liable for all wrongful acts committed by their agents, employees, consultants and/or representatives.

127. Specifically, Defendants affirmatively represented to Plaintiff and St. Michael that it would receive the benefit of the "one-stop shop" for trucking services through the RICO enterprise.

128. The individual Defendants, are RICO "persons" as defined by 18 USC §1961(3).

129. Defendants combined through an association in fact to form a RICO enterprise, as defined by 18 USC §1961(4), involving the named Defendants, and used the enterprise to further their illegal means.

130.    The goals and purposes of the Flying J Network RICO enterprise were to illegally obtain the monies, properties and assets of St. Michael and the Plaintiff for the use and benefit of Defendants.

131.    The enterprise existed and exists separate and apart from the pattern of racketeering activity and is a separate and distinct "enterprise" within the meaning of 18 USC §§1961(4) and 1962(b), (c), and 9(d), constituting an "enterprise", an "association in fact," or a "de facto association" within the meaning of 18 U.S.C. §1961(4).

132.    The named Defendants are and/or were principal actors associated with the illegal enterprise affecting interstate or foreign commerce.

133.    At Defendants' direction, the Plaintiff's assets were taken and commingled in furtherance of the illegal scheme, to pay the various entities within the Flying J network.

134.    Using the related entities, Defendants used the agents, employees, consultants, subsidiaries, and individuals of the enterprise to carry out the illegal scheme.

135.    The illegal scheme was carried out via US Mail by check, money order, and/or wire transfers and internet.

136.    Despite the promises made to the Plaintiff and St. Michael, Defendants had no intention of fulfilling the "one-stop shop" network promise, but intentionally manipulated the accounts and assets of the Plaintiff and St. Michael within its control with the intention of repossessing its properties and taking over its accounts.

137.    Through the repetition of this fraud, the Flying J network RICO scheme and pattern of illegal activities has taken in an unknown amount of money from St. Michael and the Plaintiff.

## B. MAIL, WIRE AND BANKRUPTCY FRAUD

138.    The Defendants committed acts of wire fraud in violation of 18 USC §1343, each of which is a predicate act in violation of 18 USC §1962 by use of telephone communications and electronic mail communications in furtherance of the unlawful scheme, made fraudulent misrepresentations over the telephone wires and via electronic mail, each and all of which were a direct and proximate cause of damages to the Plaintiff.

139.    The Defendants used the United States mail in furtherance of the fraudulent, wrongful, and unlawful scheme, in violation of 18 USC   §1341, each act of which constitutes a predicate act under 18 USC §1962, and each of which was direct and proximate cause of damages to the Plaintiff.

140.    As described above, Defendants directly and indirectly conducted and participated in the conduct of the enterprise through a pattern of racketeering activity in violation of 18 USC §1962(b), (c), and (d).

141.    The transmission of these documents and the making of these communications through the United States mail and interstate wires were for the purpose of, among other things, inducing the Plaintiff and St. Michael to entrust their monies, accounts and properties to the Defendants, thereby securing Plaintiff's and St. Michael's total reliance on and continued cooperation and participation with Defendants. Thus, the communications were made in connection with and for the purpose of executing a scheme to defraud the Plaintiff and St. Michael and to conceal from the Plaintiff and St. Michael the truth regarding the Defendants' activities and the subject transactions.

142.    The fraudulent documents and communications misrepresented and omitted material information, and were calculated to deceive persons of ordinary prudence and comprehension.

143.    As described above, the Defendants, through their enterprise, knowingly, willfully, and intentionally communicated through methods of wire and mails, false and misleading information to the Plaintiff and St. Michael.

144.    Defendants benefitted directly from their racketeering activity.

145.    The actions of the Defendants, individually and acting in concert with one another as set forth above, also amount to bankruptcy fraud and fraud in insolvency in violation of 11 USC §§152, 153 and 157 and TCA §39-14-117, as set forth hereinabove.

146.    Each of the various wrongful acts set forth hereinabove, is a specific, predicate act by Defendants to carry out and accomplish their unlawful scheme. The Defendants, through the pattern of such activities, knowingly participated in said wrongful acts, all in violation of 18 USC §1961, et seq.

147.    Defendants' actions, as set forth above, taken in concert, amount to a conspiracy to engage in illegal and unlawful racketeering activities.

148.    The Defendants engaged in the above-referenced multiple activities which adversely affected interstate commerce and by which they targeted multiple victims, including the Plaintiff.

## COUNT IV

## FRAUDULENT CONCEALMENT

149.    The allegations of paragraphs 1 through 148 hereinabove are reiterated and incorporated as if fully set forth herein.

150.    Defendants had a duty to disclose all material facts of the transaction to Plaintiff.

151.    Defendants intentionally concealed and/or intentionally failed to disclose all material facts of the transactions to Plaintiff.

152.    Plaintiff suffered financial injury as a result of Defendants' failure to disclose all relevant facts of the transaction

153.    Defendants took affirmative action to conceal the cause of action from the Plaintiffs.  Defendants also remained silent regarding material facts pertaining to the cause of action and failed to disclose. Defendants also had knowledge of the facts giving rise to the cause of action.

154. Plaintiffs could not have discovered the cause of action despite exercising reasonable care and diligence. The Defendants concealed material facts from the Plaintiff by withholding information and creating devices or artifices to deceive the Plaintiffs.

## COUNT V

## NEGLIGENT MISREPRESENTATION

155.    The allegations of paragraphs 1 through 154 hereinabove are reiterated and incorporated as if fully set forth herein.

156.    Defendants, in the course of their transactions with Plaintiffs, supplied false information to Plaintiffs who justifiably relied on said false information to their detriment.

157.    Defendants failed to exercise reasonable care or competence in obtaining and communicating this information to Plaintiffs.

158.    Plaintiffs suffered economic harm as a result of the Defendants negligent misrepresentation.

## COUNT VI

## MALICIOUS PROSECUTION

159.    The allegations of paragraphs 1 through 158 hereinabove are reiterated and incorporated as if fully set forth herein.

160.    Plaintiffs allege that the Defendant, Transportation Alliance Bank, Inc. has engaged in Malicious Prosecution by filing an action in the Second Judicial District Court in and for Weber County, State of Utah case No. 100908498 (the "Utah action")  against him and his mother.

161.    Plaintiffs allege that Transportation Alliance Bank, Inc. lacked probable cause to support the allegations in the Utah action.

162.    Plaintiffs allege that Transportation Alliance Bank, Inc. knew or should have known through reasonable investigation that the amount owed was the result of fraud against the Plaintiff and his business, St. Michael Motor Express, Inc.

163.    Transportation Alliance Bank, Inc. failed to investigate reasonably the facts and circumstances of the allegations against Plaintiffs before filing the Utah action.

164.    Transportation Alliance Bank, Inc. with malice and an improper motive because they knew or should have known that the allegations in the Utah action were the result of fraud.

165.    Transportation Alliance Bank, Inc. filed the Utah action for the improper motive and purpose of intimidating, embarrassing and coercing the Plaintiff in an effort to recover monetary settlement from Plaintiff.

166.    Defendant Transportation Alliance Bank, Inc.is liable to the Plaintiffs for the malicious prosecution of the Utah action.

## COUNT VII

## ABUSE OF PROCESS

167.    The allegations of paragraphs 1 through 166 hereinabove are reiterated and incorporated as if fully set forth herein.

168.    Plaintiffs aver that Transportation Alliance Bank, Inc. filed the Utah action for the improper motive and purpose of intimidating, embarrassing and coercing Plaintiffs in an effort to recover monetary settlement for reasons that were clearly false and fraudulent.

169.    Defendant Transportation Alliance Bank, Inc. abused the judicial process by attempting to recover a monetary settlement for an action that was filed based on false allegations.

170.    Defendant Transportation Alliance Bank, Inc.is liable to Plaintiffs for abuse of process in filing and prosecuting the Utah action.

## COUNT VIII

## COMMON LAW UNCONSCIONABILITY

171.    The allegations of paragraphs 1 through 170 hereinabove are reiterated and incorporated as if fully set forth herein.

172.    Plaintiff alleges that Defendants, in concert, individually and/or through their agents, engaged in conduct and/or received the fruits of conduct so clearly outrageous, oppressive, and of unfair surprise to Plaintiff, as evidenced in the facts and on the face of purchase documents described herein, as to be both procedurally and substantively unconscionable.  Plaintiff was misled and was not provided adequate disclosures and therefore lacked a meaningful choice in the contract.  In addition, the terms of the contract are unreasonably harsh as evidenced in this Complaint.

173. As a result of said Defendants' acts, Plaintiff has suffered direct injury. Defendants are liable to Plaintiff for their damages as shall be proven, resulting from such unconscionability.

## V.     INJURIES AND DAMAGES

174. Defendants' wrongful racketeering activities directly and proximately resulted in financial and economic damages to the Plaintiff, separate and apart from the damages suffered by St. Michael, including, but not limited to, loss of money, profits, business opportunities, value, properties, assets, and other damages to be proven at trial.

175. In addition to above stated economic damages, Plaintiff has suffered other damages, including but not limited to severe emotional distress, injury to reputation, attorney's fees and loss of business opportunity.

176. As the direct and proximate result of the violation of the provisions of 18 USC §1961, et seq., the Plaintiff is entitled to recover, pursuant to 18 USC §1964(c), judgment against Defendants for all damages caused by such illegal conduct in an amount determined as reasonable by the jury and/or fact finder, the same to be trebled, along with all of the costs and expenses of this litigation, including reasonable attorneys' fees.

177. Plaintiff is entitled to a tolling of the RICO claim, because Defendants, through their conduct and the conduct of their agents, have affirmatively misrepresented to and/or concealed from the Plaintiff and St. Michael material facts concerning the transactions, as described above.

## VI.     PRAYER FOR RELIEF

Premises considered, the Plaintiff, prays:

(A)     That the Defendants be required to answer the Complaint filed herein, their oath thereto being waived;

(B)     The Court to set a hearing for a preliminary injunction requested in this cause and enjoin the Defendants from further attempting to collect on the judgment obtained in the Utah action.  THIS IS THE FIRST REQUEST FOR INJUNCTIVE RELIEF.

(C)     Pursuant to Count I of the Complaint, Fraud/Tortious Misrepresentation/Fraudulent Transfer, the Plaintiff  be granted judgment against Defendants and recover compensatory damages as determined to be reasonable by the jury and/or fact finder along with punitive damages in an amount deemed to be reasonable by the jury;

(D)     Pursuant to Count II of the Complaint, Tortious Conspiracy, the Plaintiff recover judgment against the defendants for compensatory damages as may be determined by a jury and/or fact finder to be reasonable, along with punitive damages in an amount determined to be reasonable by the jury;

(E)     That pursuant to Count III of the Complaint, Civil RICO, the Plaintiff recover judgment against Defendants, for compensatory damages as determined to be reasonable by a jury and/or fact finder, the same to be trebled, along with the expenses and costs of this cause and reasonable attorneys' fees;

(F)     Pursuant to Count IV of the Complaint, Fraudulent Concealment, the Plaintiff recover judgment against the defendants for compensatory damages as may be determined by a jury and/or fact finder to be reasonable, along with punitive damages in an amount determined to be reasonable by the jury.

(G)      Pursuant to Count V of the Complaint, Negligent Misrepresentation, the Plaintiff recover judgment against the defendants for compensatory damages as may be determined by a jury and/or fact finder to be reasonable in an amount determined to be reasonable by the jury.

(H)      Pursuant to Count VI of the Malicious Prosecution, the Plaintiff recover judgment against the defendants for compensatory damages as may be determined by a jury and/or fact finder to be reasonable, along with punitive damages in an amount determined to be reasonable by the jury.

(I)      Pursuant to Count VII of the Complaint, Abuse of Process, the Plaintiff recover judgment against the defendants for compensatory damages as may be determined by a jury and/or fact finder to be reasonable, along with punitive damages in an amount determined to be reasonable by the jury.

(J)      Pursuant to Count VIII of the Complaint, Common Law Unconscionability, the Plaintiff recover judgment against the defendants for compensatory damages as may be determined by a jury and/or fact finder to be reasonable, along with punitive damages in an amount determined to be reasonable by the jury

(K)      Plaintiff reserves the right to amend this complaint and any *ad damnum* claimed herein as additional investigation and discovery proceeds and other facts become known;  and

(L)      Plaintiff demands a jury to try the issues when joined.

Respectfully submitted,

WEINMAN & ASSOCIATES


/s/ Michael L. Weinman
Michael L. Weinman (#15074)
112 S. Liberty Street, Ste. 321
P. O. Box 266
Jackson, TN 38302
731-423-5565
mike@weinmanandassoc.com