| | |
|---|---|
| **LOUIS SAIA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**FLYING J, INC.,**<br>**FJ MANAGEMENT, INC. d/b/a FLYING J, INC.;**<br>**FLYING J. INSURANCE SERVICES, INC. and/or its**<br>**Successor, THE BUCKNER COMPANY;**<br>**TRANSPORTATION ALLIANCE BANK, INC.;**<br>**TRANSPORTATION ALLIANCE LEASING, LLC;**<br>**TAB BANK, INC.; TAB BANK, INC. d/b/a/**<br>**TRANSPORTATION ALLIANCE LEASING, LLC;**<br>**JAGIT "J.J." SINGH, STEPHEN PARKER,**<br>**JOHN DOES A, B, and C AND JANE DOES A, B, and C**<br><br>**Defendants.** | No. 15-cv-01045-STA-egb |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Before the Court are Defendants Transportation Alliance Bank, Inc.; Transportation Alliance Leasing, LLC; Stephen Parker; FJ Management, Inc. d/b/a Flying J, Inc.;Fying J Insurance Services, Inc. and/or its Successor The Buckner Company's (hereinafter "TAB and Flying J Defendants") Joint Motion to Dismiss (ECF No. 46) and Defendant Jagjit "J.J." Singh's Motion to Dismiss (ECF No. 47), both filed on June 5, 2015. Plaintiff Louis Saia filed suit on March 2, 2015, and proceeded with counsel until the United States Magistrate Judge granted counsel's motion to withdraw on

June 11, 2015. On July 1, 2015, the Magistrate Judge gave Plaintiff 90 days in which to retain new counsel or proceed *pro se*. On September 28, 2015, Plaintiff filed notice with the Court of his intent to proceed *pro se*, and on October 1, 2015, the Court ordered Plaintiff to respond to Defendants' separate Motions to Dismiss. Plaintiff filed his opposition to the Motions to Dismiss (ECF No. 63, 64, 66, 67) on October 16, 2015, and supplemented his response (ECF No. 68, 69) on October 29, 2015. Defendants have filed reply briefs in further support of their Motions (ECF No. 71, 73, 77). Defendants' Motions to Dismiss are now ripe for determination. For the reasons set forth below, the Motions to Dismiss are **GRANTED**.

<u>BACKGROUND</u>

Plaintiff's Complaint alleges claims against Defendants for fraud, tortious conspiracy, a civil claim for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), fraudulent concealment, negligent misrepresentation, malicious prosecution, abuse of process, and common law unconscionability. For purposes of Defendants' Motions to Dismiss, the Court accepts the following well-pleaded factual allegations of the Complaint as true. Plaintiff Louis Saia was at all times relevant the sole shareholder, president and CEO of Saint Michael Motor Express ("St. Michael"), a Tennessee corporation, having its principal place of business at 141 Law Road, Jackson, TN 38305. (Compl. ¶ 4.) Plaintiff formed St. Michael in 2002. (*Id.* ¶ 17.) Plaintiff invested approximately $10 million from his personal funds into the capital of St. Michael and became, along with his mother, Ann M. Saia, a personal guarantor of certain indebtedness incurred by St. Michael. (*Id.* ¶ 19.) St. Michael was in the business of providing over-the-road transportation services for goods and products in the United

States and, in particular, refrigerated transport services.  (*Id.* ¶ 20.)

## I. St. Michael's Business with TAB and Flying J Defendants

Defendant Jagjit "JJ" Singh ("Singh") is an individual who at all times relevant served as employee, agent, vice-president of financial services for Flying J Inc., vice-president of financial and communication services for Flying J Inc., director of Flying J Insurance Services, Inc., and CEO and chairman of Transportation Alliance Bank, Inc. ("TAB"), a wholly owned and operated subsidiary of Flying J, Inc.  (*Id.* ¶ 10.)  As St. Michael's business expanded, Singh approached Plaintiff to solicit all of St. Michael's financing, leasing, insurance, banking, factoring, diesel fuel purchases, and transport services business on behalf of Defendant Flying J, Inc. and its subsidiaries. (*Id.* ¶ 22.)  In April 2006, Plaintiff agreed to conduct all of St. Michael's business, except for the factoring and fuel purchases, through the Flying J network.  (*Id.* ¶ 26.)

Specifically, St. Michael's banking, bank accounts, credit line, and other related services were established with TAB, a wholly owned and operated subsidiary of Flying J, Inc.  (*Id.*)  All financing of St. Michael's trucking fleet and of the related leases were to be conducted through the bank or its subsidiary, Transportation Alliance Leasing, LLC. (*Id.*)  St. Michael's insurance was obtained through Flying J Insurance Services, Inc. (*Id.*) St. Michael subsequently moved its factoring and fuel purchases to Flying J entities in approximately October 2007 and June 2008, respectively.  (*Id.*)  TAB also extended St. Michael a line of credit, personally guaranteed by Plaintiff and his mother, Ann Saia, in the amount of $800,000.00. (*Id.* ¶ 27.)

Defendant Stephen Parker ("Parker") is an individual who at all times relevant was serving or had served as TAB's vice-president of commercial loans with and also as an officer and/or agent and representative of Transportation Alliance Leasing, LLC, a

subsidiary of TAB. (*Id.* ¶ 11.) On June 21, 2006, Parker in his capacity as vice-president of TAB advised Plaintiff on the type and amount of insurance coverage required for St. Michael's fleet and cargo. (*Id.* ¶ 30.) Parker put Plaintiff in touch with Flying J Insurance Services, Inc. and advised him to send a security deposit and insurance to Transportation Alliance Leasing, LLC. (*Id.*) The final result of St. Michael's doing business with Defendants was its fleet of tractors and trailers were financed through Flying J/TAB/Transportation Alliance Leasing, LLC; St. Michael transacted all of its banking with TAB; St. Michael purchased all of its liability and cargo insurance through Flying J Insurance Services, Inc.; and St. Michael purchased its fuel through Flying J with participation in the Flying J discount rebate program. (*Id.* ¶ 31.)

Plaintiff alleges that Defendants collectively and in concert with each other used the factoring agreement between St. Michael and TAB, which was itself a contract of adhesion, to effectively take control of St. Michael's and Plaintiff's operations and enabled the Defendants and the Flying J network to carry out a scheme to take over Plaintiff's assets. (*Id.* ¶ 38.) TAB not only wrongfully charged St. Michael $127,151.61 in improper late fees, (*Id.* ¶ 39.) TAB and the Flying J Defendants also wired money from St. Michael's accounts receivable and line of credit accounts to other accounts used for Defendants' benefit. (*Id.* ¶ 40.) As a result, Defendants gained total control over (a) St. Michael's line of credit and payments to the account, (b) the liability and cargo insurance and payments, (c) St. Michael's access to fuel, fuel rebate payments, and fuel credit accounts, (d) St. Michael's payments on all accounts and/or services provided by The Flying J network, (e) St. Michael's customer base and collection of receivables owed to St. Michael for current and past due accounts, and (f) St. Michael's payments on leased

equipment. (*Id.* ¶ 41.) Taken together, Defendants had control over St. Michael's working capital and cash flow. (*Id.*)

On May 22, 2008, St. Michael filed for Chapter 11 bankruptcy reorganization and protection. (*Id.* ¶ 45.) During St. Michael's Chapter 11 bankruptcy, Plaintiff and his family used personal funds and assets to meet all of St. Michael's obligations including payments on tractor/trailers leased by St. Michael. (*Id.* ¶ 46.) Plaintiff also downsized the company and took steps to improve St. Michael's business. (*Id.*) On December 22, 2008, Defendant Flying J, Inc., along with its related affiliates, confronted with an extraordinarily huge cash flow shortage, filed its own petition for Chapter 11 bankruptcy reorganization in the United States Bankruptcy Court for The District of Delaware, Case No. 08-13384(MFW). (*Id.* ¶ 47.)

## II. St. Michael's Liability Insurance Coverage

On or about June 18, 2009, St. Michael received notice that Carolina Casualty Insurance Company ("Carolina Casualty") would not renew St. Michael's liability insurance coverage for its trucking fleet, policy number CPT 351668. (*Id.* ¶ 51.) Carolina Casualty addressed the notice to Flying J Insurance Services, Inc. (*Id.*) Katie London ("London"), Flying J Insurance Services, Inc.'s fleet department manager and Plaintiff's agent and representative at Flying J Insurance, notified Plaintiff of the non-renewal but assured him that Defendants would be able to place the insurance coverage for St. Michael with Carolina Casualty or another carrier. (*Id.*) In fact, on August 18, 2009, London received confirmation from Carolina Casualty that St. Michael's insurance would be reinstated. (*Id.*) London notified Plaintiff that she had obtained a quote for St. Michael's coverage and that the insurance company would reissue the policy upon receipt

of specified assurances as to premium payment, assurances Plaintiff immediately gave. (*Id.*)

On September 16, 2009, Carolina Casualty issued St. Michael an offer quote for liability insurance for St. Michael's fleet of tractors and trailers, policy #CGP-351668-Q, with a policy period running from September 20, 2009, through September 20, 2010. (*Id.* ¶ 55.) The annual premium quoted by Carolina Casualty was $521,428, and the quote would remain open until the expiration date of the then existing policy, number CPT351668, or until September 20, 2009, the reinstated policy's expiration date. (*Id.*) London also informed Plaintiff that he would be required to make a 20% deposit of the total premium. (*Id.* ¶ 58.) Plaintiff responded to London that he would make the payment and then proceeded to made arrangements to obtain the funds. (*Id.* ¶ 60.) At the time of these communications, the existing liability insurance with Carolina Casualty, policy number CPT351668, remained in effect and had even been extended by Carolina Casualty beyond the original policy expiration date until October 22, 2009. (*Id.* ¶ 62.) The Complaint alleges on information and belief that the Flying J Defendants required the 20% premium deposit, assuming that St. Michael and/or Plaintiff would be unable to fund the deposit on such short notice. (*Id.* ¶ 59.) The Flying J Defendants hoped to use the premium deposit as a pretense for repossessing St. Michael's trucking fleet and obtaining its equity in the fleet. (*Id.*)

On or about September 19, 2009, Parker called Plaintiff on his cell phone and informed him that Carolina Casualty would not insure St. Michael after all. (*Id.* ¶ 62.) When Plaintiff demanded to speak with Singh, Parker responded that TAB planned to file an emergency motion in St. Michael's bankruptcy proceeding to allow TAB to take

control of and repossess St. Michael's trucking fleet because St. Michael was operating the fleet illegally without liability insurance. (*Id.*) Plaintiff later called London to question her about the coverage, and she responded that she was not authorized to speak with him about the matter. (*Id.* ¶ 63.)

On September 22, 2009, TAB and its subsidiary Transportation Alliance Leasing, LLC filed the emergency motion in the Plaintiff's Chapter 11 bankruptcy proceeding. (*Id.* ¶ 65.) Defendants represented to the Bankruptcy Court that they had received Carolina Casualty's June 18, 2009 "Notice of Nonrenewal of Insurance" for liability coverage on numerous trucks leased by St. Michael and that the St. Michael's fleet of tractor-trailers were presently being operated "over-the-road" illegally because they did not have liability and cargo insurance coverage. (*Id.*) TAB sought immediate repossession of all of St. Michael's leased vehicles and equipment and an order of abandonment. (*Id.* ¶ 66.) Additionally, Defendants requested that the Bankruptcy Court grant them the existing funds in St. Michael's accounts receivables in order to take possession of the tractors and trailers and bring them under TAB's control. (*Id.*)

On September 23, 2009, TAB and Transportation Alliance Leasing, LLC, appeared in the Bankruptcy Court to argue the emergency motion. (*Id.* ¶ 68.) At roughly the time of the hearing, Parker again called Plaintiff, who was then traveling in Louisiana. (*Id.* ¶ 70.) Parker told Plaintiff that if he, in his capacity as the president and sole owner of St. Michael, did not consent to the emergency motion and the repossession of St. Michael's fleet, the vehicles would be operating without insurance, the trucks and their cargo would be stranded, and the customers' cargo would perish. (*Id.*) Accepting

Parker's fraudulent misrepresentation that Defendants could not procure insurance for St. Michael's fleet and in an effort to continue operating and protect St. Michael's customers, Plaintiff called his attorney and his wife who were at that time attending the emergency motion hearing in Bankruptcy Court and instructed them to consent to the motion. (*Id.*) Based on Parker's false representations, St. Michael not only acquiesced in the repossession of the trucks and trailers and use of the accounts receivables but also unknowingly waived any and all defenses to the seizure or misrepresentations by consenting to the Bankruptcy Court's order. (*Id.* ¶ 71.)[1] Defendants did, in fact, take possession of St. Michael's trucking fleet and disposed of the vehicles, which Plaintiff alleges had a value of approximately $4 million. (*Id.* ¶¶ 74, 75.)

Plaintiff alleges that Defendant knowingly misled him and the Bankruptcy Court about the status of St. Michael's liability insurance coverage. (*Id.* ¶ 73.) Although TAB appeared at the hearing and represented to the Bankruptcy Court that a notice of nonrenewal had been issued on June 18, 2009, TAB failed to disclose that Parker had instructed London in August 2009 to negotiate a renewal or reinstatement of St. Michael's policy with Carolina Casualty. (*Id.* ¶ 72.) TAB also failed to inform the Bankruptcy Court that London had told Plaintiff St. Michael's would get coverage, that London had applied for a renewal of the policy on behalf of St. Michael, and that the insurance company had agreed to renew the coverage. (*Id.*) On the same day as the emergency hearing, Carolina Casualty had forwarded to Flying J another quote for St. Michael's fleet of tractors and trailers with an annual premium of $427,500.00 and a

---

[1] This final allegation, the legal effect of St. Michael's consent to the emergency motion, strikes the Court as a legal conclusion as opposed to a fact pleading. The Court includes the statement here for the sake of a complete recitation of the Complaint's allegations.

policy period running from September 24, 2009 through September 24, 2010.  (*Id.* ¶¶ 68, 69.)

The Complaint alleges that Defendants' actions and misrepresentations were part of a larger scheme and conspiracy to defraud the Plaintiff and St. Michael.  On October 29, 2010, TAB filed suit in Utah state court to collect money Defendants had extended to St. Michael through a line of credit personally guaranteed by Plaintiff and his mother. (*Id.* ¶ 88.)  On August 27, 2014, the Utah court ruled that Plaintiff was liable for breach of contract based on his personal guarantee of St. Michael's $800,000.00 line of credit and subsequently awarded TAB $1,830,802.94 in damages and pre- and post-judgment interest accruing at a rate of 30% per annum. (*Id.* ¶ 95.)[2]  Plaintiff alleges that TAB obtained the judgment against him based on additional fraudulent misrepresentations to the Utah court during the damages hearing.  (*Id.*)

During the discovery phase of the suit in Utah, Plaintiff learned from Carolina Casualty that the insurance company had provided Flying J Insurance with a quote for the renewed policy on September 16, 2009, one week before Defendants appeared before the Bankruptcy Court and represented that St. Michael had no liability coverage.  (*Id.* ¶ 90.) Upon the discovery of this fact, Plaintiff turned the information over to the trustee in St. Michael's bankruptcy proceeding.  (*Id.*)  The trustee filed an adversary proceeding in the Bankruptcy Court alleging fraud and civil RICO violations.  (*Id.*)

Based on these factual allegations, the Complaint alleges claims against Defendants for fraud (including fraud on the Plaintiff, St. Michael, and the Bankruptcy

---

[2] The Complaint also includes allegations about the Utah court's judgment in favor of TAB on its claim that St. Michael's had a deficit of $57,382.97 in its accounts receivables for which Plaintiff was personally liable.  (Compl. ¶¶ 91, 92.)

Court), tortious conspiracy, civil RICO violations (with predicate acts of mail, wire, and bankruptcy fraud), fraudulent concealment, negligent misrepresentation, malicious prosecution, abuse of process, and common law unconscionability. Defendants' separate Motions to Dismiss largely overlap and argue a number of grounds for the dismissal of the Complaint.[3]

Defendants first contend that Plaintiff's claims are res judicata in light of the previous litigation between these parties in the state of Utah. Specifically, Plaintiff asserted some of the same causes of action against Defendants in his counterclaim and third-party complaint in the Utah case. The Utah court dismissed Plaintiff's claims for lack of standing, holding that the claims belonged to St. Michael and not Plaintiff. The Utah court ultimately granted Defendants summary judgment on their claims for relief against Plaintiff. Defendants also note that Plaintiff filed his own suit against Defendants in Utah state court alleging the same causes of action stated in his counterclaim and third-party complaint, and the Utah court in the second case granted Defendants' motion to dismiss the complaint for failure to state a claim. Defendants request that the Court take judicial notice of the proceedings in Utah and have attached a copy of the pleadings from the Utah cases as exhibits to their Motions to Dismiss. Defendants also argue that the allegations of Plaintiff's Complaint in the case at bar are largely identical to the allegations made in adversary proceeding filed by the bankruptcy trustee on behalf of St. Michael. According to Defendants, the Bankruptcy Court granted their motion to dismiss the adversary proceeding on August 21, 2015. Under the circumstances,

---

[3] Defendant Singh apparently filed a separate Rule 12(b)(6) Motion because the Complaint does not allege its claims for abuse of process and malicious prosecution against him. Otherwise, the two Motions to Dismiss present the same procedural history of the actions involving these parties and track the same legal arguments for dismissal.

Plaintiff's claims are now res judicata.

Defendants next argue that the doctrine of collateral estoppel or issue preclusion applies in the case to prevent Plaintiff from relitigating issues already decided in the Utah case. The Utah court concluded that Plaintiff lacked standing to assert many of the same claims he now asserts before this Court. All of the elements of collateral estoppel apply to preclude Plaintiff from relitigating the issue of standing after Plaintiff had a full and fair opportunity to litigate the issue in the prior case between these same parties and the privies. To the extent that collateral estoppel does not apply in this case, Defendants argue that Plaintiff nevertheless lacks standing to seek redress for the claims that properly belong to St. Michael. In an alternative argument, Defendants state that Plaintiff's Complaint amounts to an improper collateral attack on the judgments of the Utah courts and the Bankruptcy Court. For all of these reasons, the Court should dismiss the Complaint without reaching the merits. Even if the Court did decide to consider the merits of the pleadings, Defendants argue that the Complaint fails to state any timely or plausible claim for relief or any claim sounding in fraud with the particularity required under Federal Rule of Civil Procedure 9(b). Therefore, Defendants are entitled to dismissal of Plaintiff's Complaint in its entirety.

Plaintiff has responded in opposition to each of the Motions to Dismiss, though the separate response briefs are largely identical. Plaintiff begins by restating many of the factual allegations of his Complaint and his belief that Defendants perpetrated a fraud on him and the Bankruptcy Court when Defendants filed the emergency motion to take possession of St. Michael's trucking fleet. According to Plaintiff, Defendants also fraudulently misrepresented the state of affairs to the Utah court. As for the merits of his

Complaint, Plaintiff argues that unlike the previous litigation between the parties, the new suit alleges Defendants' civil violations of RICO. Plaintiff argues that his RICO claims did not accrue until after his counterclaims in the Utah suit were dismissed for lack of standing. Plaintiff also did not discover Defendants' other alleged acts of fraud and conversion until the trustee reopened St. Michael's bankruptcy proceedings in September 2012. Plaintiff maintains then that he has never "had his day in court" as to these facts or causes of action.

Plaintiff also explains that he filed his own complaint in Utah state court as a "placeholder" suit "with the intention of dismissing that suit if [the Utah judge in the first suit] allowed [Plaintiff's] Third Party Complaint and Counterclaims to go before his court."[4] When the Utah court dismissed Plaintiff's "placeholder" suit, Plaintiff contends the dismissal was not on the merits. Plaintiff actually filed a motion for voluntary dismissal, which the Utah court ignored when it decided to reach the merits of Defendants' motion to dismiss the "placeholder" suit instead. Plaintiff adds that he amended his Counterclaim and Third-Party Complaint in the other Utah suit to include allegations about Defendants concealing the insurance quote from the Bankruptcy Court during the hearing on the emergency motion to take possession of St. Michael's assets. Plaintiff argues then that his "placeholder" suit never included these allegations, and so no final judgment on the merits of these issues was ever issued in Utah.

Finally, Plaintiff contends that the Utah court's dismissal of his Counterclaim and Third-Party Complaint for lack of standing was a procedural issue, and not a decision on the merits. By contrast, the case at bar includes new factual allegations, names new

---

[4] Pls.' Resp. in Opp'n to Defs. Jt. Mot. to Dismiss 4 (ECF No. 63).

Defendants as parties, and asserts for the first time Plaintiff's civil RICO claim. In particular Plaintiff alleges here that Defendants engaged in a RICO scheme targeting Plaintiff personally. With respect to the Bankruptcy Court's dismissal of the adversary proceeding making many of the same allegations against these Defendants, Plaintiff argues that the trustee represented St. Michael and not Plaintiff. Plaintiff was not a party to the adversary proceeding in any way and had no input in the prosecution of those claims. Plaintiff's Complaint does not seek damages on behalf of St. Michael but on behalf of Plaintiff himself. Therefore, the doctrines of res judicata and collateral estoppel do not bar Plaintiff's Complaint before this Court, and Plaintiff's RICO claim cannot constitute a collateral attack on the judgments of other courts.

In their reply briefs, Defendants highlight that since the filing of their opening briefs, the United States Bankruptcy Court for the Western District of Tennessee dismissed nearly identical claims asserted on behalf of St. Michael in the adversary proceeding. The Bankruptcy Court dismissed St. Michael's civil RICO conspiracy claim predicated on the same facts as Plaintiff's civil RICO claim. Plaintiff's Complaint is in its essence a collateral attack on the previous judgments of other courts, a challenge Plaintiff lacks the standing to mount. Defendants reiterate the other arguments advanced in their opening briefs and argue that the Complaint must be dismissed.[5]

## STANDARD OF REVIEW

---

[5] Plaintiff has filed Motions for Leave to File a Sur-Reply (ECF Nos. 93, 94, 95). However, Plaintiff has given no reasons why a sur-reply is warranted in this case and has not shown that his sur-reply would address the standing issue, on which the Court is basing its ruling. Furthermore, Plaintiff's motions to amend his complaint remain pending and provide Plaintiff with another opportunity to raise any additional issues with the Court. Therefore, the Motions to file a sur-reply are **DENIED**.

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party.[6] However, legal conclusions or unwarranted factual inferences need not be accepted as true.[7] "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim."[8] Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[9] Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[10] In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face."[11] "A claim has facial plausibility

---

[6] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992).

[7] *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

[8] *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

[9] Fed. R. Civ. P. 8(a)(2).

[10] *Ashcroft v. Iqbal,* 556 U.S. 662, 681 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). *See also Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) (quoting *Twombly,* 550 U.S. at 555).

[11] *Twombly*, 550 U.S. at 555, 570.

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[12]

**ANALYSIS**

The Court need not reach all of the issues presented in Defendants' Motions to Dismiss. Defendants have contested Plaintiff's standing to bring claims that properly belong to his company St. Michael. Because standing is "the threshold question in every federal case," the Court will address this dispositive issue at the outset.[13]

**I. Standing**

The United States Supreme Court has stated that the standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into "a vehicle for the vindication of the value interests of concerned bystanders."[14] The party "seeking federal court action" bears the burden to demonstrate all of the elements of Article III standing including injury-in-fact.[15] The Complaint alleges that Plaintiff was president, CEO, and sole shareholder of St. Michael and that Plaintiff had made significant capital contributions to St. Michael and certain personal guaranties for the corporation's debts, including an $800,000.00 line of credit guaranteed by Plaintiff and his mother.[16] The Complaint alleges that Defendants' engaged in a

---

[12] *Iqbal*, 556 U.S. at 678.

[13] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[14] *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 473 (1982) (quoting *United States v. SCRAP,* 412 U.S. 669, 687 (1973)).

[15] *McGlone v. Bell*, 681, F.3d 718, 728 (6th Cir. 2012) (citing *Rosen v. Tenn. Comm'r Fin. & Admin.*, 288 F.3d 918, 927 (6th Cir. 2002)).

pattern of fraud and tortious conduct to take control of St. Michael's assets, including by implication Plaintiff's capital contributions to the corporation, and to collect debts incurred by St. Michael from Plaintiff in his capacity as a personal guarantor for St. Michael's liabilities.

The Sixth Circuit has held that a plaintiff, even a sole shareholder, cannot maintain in his own name "an action to redress injuries to a corporation."[17] Likewise, a personal guarantor of a corporation's liabilities and obligations lacks standing to seek redress for injuries to the corporation.[18] As the Court of Appeals has explained, "any redressable injury must flow from individualized harm done to the plaintiff, separate from any claims that the corporation may assert."[19] Under Tennessee law, a corporation

---

[16] Compl. ¶¶ 18, 19, 27.

[17] *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 602-03 (6th Cir. 1988) (quoting *Schaffer v. Universal Rundle Corp.,* 397 F.2d 893, 896 (5th Cir. 1968)).

[18] *Quarles v. City of E. Cleveland*, 202 F.3d 269, at *4 (6th Cir. 1999) (unpublished per curiam decision); *see also Niemi v. Lasshofer*, 728 F.3d 1252, 1260 (10th Cir. 2013) ("Every circuit to have addressed the question . . . has held that the proper plaintiff [for injury to a corporation] is the corporation, not the investor or guarantor."); *Pagan v. Calderon*, 448 F.3d 16, 29 (1st Cir. 2006) (same); *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1073 (10th Cir. 2002) (rejecting "the premise that a stockholder's status as a guarantor gives the stockholder status to assert an individual claim against a third party where that harm is derivative of that suffered by the corporation"); *Taha v. Engstrand*, 987 F.2d 505, 507 (8th Cir. 1993) (holding that in the absence of a special duty or a separate and distinct injury "guarantors of corporations generally may not bring individual actions to recover what they consider their share of the damages suffered by the corporation"); *Stein v. United Artists Corp.*, 691 F.2d 885, 896 (9th Cir. 1982) (concluding that a corporation's guarantors lack standing when their alleged injuries "reflect the injury to the corporation, which forced it to default on the loans").

[19] *Quarles*, 202 F.3d 269, at *4 (collecting cases); *see also Firestone v. Galbreath,* 976 F.2d 279, 285 (6th Cir. 1992), *modified at* 25 F .3d 323 (6th Cir. 1994) (no standing because "any harm to the [plaintiff] flows merely from the misfortunes allegedly visited upon [the corporation] by the defendants"); *Sparling v. Hoffman Constr. Co., Inc.,* 864 F.2d 635, 640-41 (9th Cir. 1988) (standing available to guarantor only when harm to

and its shareholder remain "distinct legal entities even if all the stock in the corporation is owned by one stockholder."[20]  As such, "the proper party to bring a claim on behalf of a corporation is the corporation itself acting through its directors or a majority of its shareholders."[21]  "Stockholders may bring an action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer."[22]

The Court holds that Plaintiff lacks standing to pursue his claims for relief to redress injuries to his corporation.  Just as he did in the Utah litigation, Plaintiff pursues claims properly belonging to St. Michael because he seeks damages for injuries suffered by St. Michael, and not himself.  While the Complaint alleges injuries suffered by St. Michael as a result of Defendants' conduct, the Complaint only alleges injuries to Plaintiff derivative of the injuries incurred by St. Michael.  Plaintiff's alleged personal injury from Defendants' wrongs consist of his financial losses as St. Michael went bankrupt and Plaintiff lost his capital investment in the corporation as well as Plaintiff's liability for St. Michael's debts as part of his personal guaranty agreement.  The injuries described in the Complaint do not confer standing on Plaintiff to pursue what are actually injuries to his corporation.  Therefore, Plaintiff lacks standing to pursue his claims

---

guarantor is not derivative of harm to corporation); *Taha v. Engstrand,* 987 F.2d 505, 507 (8th Cir. 1993) (recovery available when defendant owes an individual guarantor a special duty).

[20] *Hadden v. City of Gatlinburg*, 746 S.W.2d 687, 689 (Tenn. 1988) (citing *Parker v. Bethel Hotel Co.*, 34 S.W. 209, 215 (Tenn. 1896); *see also Lockhart v. Moore*, 159 S.W.2d 438, 443 (Tenn. Ct. App. 1941); 1 Fletcher Cyclopedia of the Law of Private Corporations § 36 (1983 rev.).

[21] *House v. Estate of Edmondson*, 245 S.W.3d 372, 381 (Tenn. 2008) (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 531–32 (1984)).

[22] *Hadden*, 746 S.W.2d at 689 (collecting cases).

against Defendant.

The Complaint does allege that Plaintiff participated in negotiations, reached agreements with Defendants, made certain decisions in the course of St. Michael's business, sought out information related to St. Michael's interests, and secured funding to meet St. Michael's obligations. But in each instance Plaintiff was acting in his capacity as president and CEO of St. Michael. In fact, the Complaint frequently refers to Plaintiff and St. Michael interchangeably. For example, the Complaint alleges in a single paragraph that TAB purchased St. Michael's tractors and trailers and then "in turn leased [them] *to Plaintiff* . . . under a Master Lease Agreement whereby *St. Michael, as Lessee*, leased each of the tractors for 54 months and the trailers for 60 months with the right to purchase each of them at the end of the lease term for a set price  . . . ."[23]  Elsewhere, the Complaint alleges that Plaintiff relied on certain misrepresentations made by Defendants not to his own detriment but to the detriment of St. Michael.[24]  Even though as these allegations seem to treat Plaintiff as the alter ego for his company, the Complaint taken as a whole merely shows that Plaintiff acted on behalf of St. Michael in his capacity as an officer of the corporation. The Complaint does not allege that Defendants owed Plaintiff any special duty separate and apart from his role as a corporate officer and/or shareholder of St. Michael.

In the final analysis, the Complaint alleges that Defendants caused St. Michael to suffer injuries and that Plaintiff as the sole shareholder with a large capital investment in the corporation saw his company's business suffer and as the guarantor for St. Michael

---

[23] Compl. ¶ 28 (emphasis added).

[24] *Id.* ¶ 78.

became liable for St. Michael's debts and obligations. Any claim against these Defendants belongs to St. Michael, and Plaintiff lacks standing to seek redress for any losses to the corporation. Therefore, Defendants' Motions to Dismiss must be **GRANTED** for lack of standing as to all of the claims under Tennessee law.

This leaves Plaintiff's RICO claim. As he emphasizes in his briefing, Plaintiff alleges a RICO claim against Defendants for the first time in the Complaint before the Court. The Sixth Circuit has held that standing to bring a RICO claim is slightly different than Article III standing in that RICO standing is somewhat more "onerous."[25] RICO "requires that the injury be directly caused by the defendant's predicate acts."[26] RICO's enforcement provision states that "[a]ny person injured in his business or property by reason of violation of section 1962 . . . may sue therefor in any appropriate United States district court . . . ."[27] Perhaps more to the point, the Court of Appeals has held that in the absence of some allegation that a defendant directly owes a corporation's shareholder some special duty, the shareholder does not have standing to allege a RICO claim for "wrongs and injuries . . . directed at" the corporation.[28]

The Court holds that the Complaint also fails to allege facts showing that Plaintiff has standing to pursue a RICO claim against Defendants. Just as with Plaintiff's claims for relief under Tennessee law, the Complaint's RICO allegations only show that

---

[25] *Stooksbury v. Ross*, 528 F. App'x 547, 554 (6th Cir. 2013) (citing *Perry v. Am. Tobacco Co., Inc.,* 324 F.3d 845, 848 (6th Cir. 2003)).

[26] *Id.*

[27] 18 U.S.C. § 1964(c).

[28] *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993) (citing *Warren v. Mfrs. Nat. Bank of Detroit*, 759 F.2d 542, 544 (6th Cir. 1985); *see also Sparling*, 864 F.2d at 640 (collecting cases).

Defendants' purported wrongdoings were directed at St. Michael, not Plaintiff personally. The Complaint alleges that Defendants conspired to use Flying J as an enterprise to defraud St. Michael and Plaintiff of their assets and property.[29]  As part of the alleged conspiracy, Defendants made certain representations to St. Michael and Plaintiff, took control assets of St. Michael and Plaintiff for their own benefit, and furthered their conspiracy by engaging in mail, wire, and bankruptcy fraud.  However, the Complaint alleges that Plaintiff only dealt with Defendants in his capacity as St. Michael's corporate officer and suffered injuries as the sole shareholder in St. Michael and a personal guarantor for St. Michael's debts.  There are no allegations in the Complaint to show that Defendants owed Plaintiff any special duty or that Plaintiff suffered any injuries independent of the injuries to his corporation.  The Court would add here that according to the Complaint, the trustee in St. Michael's bankruptcy case has brought an adversary proceeding against Defendants alleging much the same RICO claim on behalf of St. Michael.[30]  In short, Plaintiff is essentially pursuing a RICO claim that belongs to St. Michael.  The Court holds then that the Complaint fails to plead enough facts to show that Plaintiff has standing to pursue a RICO claim of his own against Defendants. Therefore, the Motions to Dismiss are **GRANTED** as to this claim.

## II. Plaintiff's Motion to Amend Complaint

Plaintiff has filed a motion to amend his complaint, which the Court has referred to the United States Magistrate Judge for determination.  Having now ruled on Defendants' Motions to Dismiss the initial Complaint, Plaintiff's motion to amend the

---

[29] Compl. ¶¶ 114-48.

[30] *Id.* ¶ 90.

complaint is ripe for determination.

## CONCLUSION

The Court holds the Plaintiff lacks standing to pursue his claims in this suit.

Therefore, Defendants' Motions to Dismiss are **GRANTED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 28, 2016.